1  Gaston Cornu-Labat, MD
2  15446 Bel-Red Road, Suite B-10
   Redmond, WA 98052
3  (425) 497-9558

_____ FILED _____ LODGED
_____RECEIVED

MAY 07 2014

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY _____ DEPUTY

4

5      **UNITED STATES DISTRICT COURT**
       **WESTERN DISTRICT OF WASHINGTON**
6

7  Gaston Cornu-Labat,                        NO.    3:14-cv-05383 RBL
8  Plaintiff;

9  v.

10 Quincy Valley Medical Center (QVMC) a/k/a
11 Grant County Hospital District No. 2 in the
   state of Washington, and Mehdi Merred, and
12 Byron Mark Vance, and M. Colleen Canfield,
13 and Sarina Fahrner, and Mary C. Klingner,
   and Charlene Brush, and Glenda Bishop,      **COMPLAINT**
14 individually and in their official capacity
15 relating to QVMC, and Donald Condit, and    **JURY TRIAL DEMANDED**
   Robert Poindexter, and Randy Zolman, and
16 Darrell Van Dyke, and Anthony Gonzalez,
17 individually and in their official capacity as
   Board Commissioners of QVMC, and Mary
18 Selecky, and Karen Ann Jensen, and Dani
   Newman, and James H. Smith, and Karen
19 Caille, and Wayne Carlson, and John Kuntz,
20 individually and in their official capacity
   relating to the Washington state Department
21 of Health (DOH), and William Gotthold, and
   Theresa Elders, and Leslie M. Burger, and
22 Richard Brantner, and Michael T.
23 Concannon, and Bruce Cullen, , individually
   and in their official capacity as
24 commissioners for the DOH Medical Quality
25 Assurance Commission.

26              **I.    INTRODUCTION**
27     1.    Plaintiff Gaston Cornu-Labat, pro se, brings this action seeking
28

COMPLAINT - 1                    **GASTON CORNU-LABAT**    15446 BEL-RED RD, STE B-
                                                          10, REDMOND WA 98052
                                                              425-497-5063

redress for damages and injunctive relief requiring expungement of medical license suspension records caused by arbitrary denial of his right to practice medicine by the MQAC consequent to a false report of professional unsuitability by QVMC, obstruction of justice, whistle blower retaliation, racketeering, and malicious prosecution without probable cause.

## II.    PARTIES

2.     Plaintiff Gaston Cornu-Labat is a resident of King County, Washington.  Plaintiff is a physician and well-known public figure in the medical field.

3.     Quincy Valley Medical Center (QVMC) is Grant County Hospital District #2, a political sub-division of the local government, and a hospital with inpatient and outpatient medical services.

4.     Defendant Mehdi Merred is an individual and resident of Grant County, Washington.  Defendant Merred is the administrator of the Quincy Valley Medical Center.

5.     Defendants Byron Mark Vance, M. Colleen Canfield, Sarina Fahrner, Mary C. Klingner, Charlene Brush, Glenda Bishop, Donald Condit, Robert Poindexter, Randy Zolman, Darrell Van Dike and Anthony Gonzalez are individuals and residents of Grant County, Washington and associated with QVMC at the time relating to this claim.

6.     Defendants Mary Selecky, Karen Ann Jensen, Dani Newman, James H. Smith, Karen Caille, Wayne Carlson, and John Kuntz are individuals and residents of Thurston County, Washington and associated with the Washington state Department of Health (DOH) in the city of Tumwater, Thurston County, Washington at the time relating to this claim.

7.     Defendants William Gotthold, Theresa Elders, Leslie M. Burger, Richard Brantner, Michael T. Concannon, and Bruce Cullen are individuals and

commissioners for the DOH Medical Quality Assurance Commission with office in Thurston County, Washington at the time relating to this claim.

### III.   VENUE AND JURISDICTION

8.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a), 42 U.S.C. §§ 1983, 1985, 1986, and 1988, 18 U.S.C. § 1961–1968.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b).

10.     One or more of the individual defendants reside in Thurston County, Washington.  A substantial portion of the events or omissions giving rise to the claim occurred in Thurston County, Washington.

11.     Venue is proper in this action because the cause of action arose within the court's jurisdiction and because one or more defendants reside in the court's jurisdiction. This court has jurisdiction over the subject matter of this complaint and over the defendants herein.

### IV.   ALLEGATIONS OF FACT

12.     The Washington State Department of Health (DOH) is a state government agency whose mission is to safeguard the safety, health and wellbeing of the people of the state of Washington.

13.     The Medical Quality Assurance Commission (MQAC) of DOH regulates the competency and quality of professional healthcare providers under its jurisdiction by establishing, monitoring, and enforcing qualifications for licensing, consistent standards of practice, continuing competency mechanisms and discipline. Rules, policies, and procedures developed by the Commission must promote the delivery of quality health care to the residents of the state of Washington.

14.     Quincy Valley Medical Center (QVMC) is Grant County Hospital District #2, a political sub-division of the local government, and a hospital with inpatient and outpatient medical services.

COMPLAINT - 3                    **GASTON CORNU-LABAT**          15446 BEL-RED RD, STE B-
                                                                10, REDMOND WA 98052
                                                                425-497-5063

15.     During the course of 2009 Dr. Gaston Cornu-Labat was asked by the QVMC authorities to participate in a project outside the scope of his employment to restructure and positively impact the function and development of this facility and improve its medical services. Dr. Cornu-Labat participated in this activity without any remuneration and in use of his free time away from his employed function as chief of the surgery department and his honorary function as chief of the medical staff. With the unfolding of Dr. Cornu-Labat's participation in this project, as expected and anticipated within the scope of the project's outline, he learned of numerous irregularities and deficiencies relating to safety codes, and certain management practices abusive to employees and overall negligent and inept; all of which jeopardized public and employee safety, employee wellbeing and ultimately negatively impacted the hospital's quality of patient care.

16.     Chief among these issues of ineptitude and negligence was a State Fire Marshall's inspection of QVMC in April of 2009 that evidenced widespread deficiencies in this facility relating to adherence to the Life Safety Code. In June of 2009, upon questioning by the licensing authorities in DOH, the hospital's CEO, Mehdi Merred, stated in response that all deficiencies had been addressed. Following this statement by Merred a surprise re-inspection in July 2009 by the State Fire Marshall evidenced that the majority of the citations had not been addressed at all.

17.     The Washington State Patrol (WSP) is charged by DOH to regularly inspect hospitals in the state regarding compliance with the Life Safety Code. These inspections must be carried out at least every 18 months according to statute.

18.     Between June 2006 and April 2009 no inspections regarding compliance with the Life Safety Code in QVMC were carried out by the WSP. Some of the citations identified in the April 2009 inspection had been code violations present in QVMC since time that predated previous inspections by WSP.

COMPLAINT - 4                    **GASTON CORNU-LABAT**    15446 BEL-RED RD, STE B-
                                                          10, REDMOND WA 98052
                                                          425-497-5063

19. Dr. Cornu-Labat voiced these concerns to the corresponding authorities in QVMC in July of 2009. Dr. Cornu-Labat made public speech of these issues

20. QVMC administrators colluded to raise false accusations against Dr. Cornu-Labat regarding his character, behavior, and professional suitability in retaliation for his voiced critiques in July of 2009. Dr. Cornu-Labat was falsely accused in bad faith of "appearing" to have lost his grip on reality, of behaving aggressively towards co-workers and of being "disruptive."

21. As a result of these false accusations Dr. Cornu-Labat was subjected to internal investigations within QVMC, subsequently cleared of all charges of unprofessional conduct, and yet unlawfully mandated by the administration to a mental health evaluation by the state's unpaired physicians program, the Washington Physicians Health Program (WPHP) in August 2009 because of "appearing not to be acting as his normal self" according to written statement from WPHP. This referral was mandated by Dr. Cornu-Labat's employer as the only option for him to return to his employment.

22. WPHP is a private group of mental health practitioners contracted by DOH to provide optional, diversionary and confidential management of "impaired" medical practitioners. It is the petitioners understanding that the bulk of the referrals to WPHP come from practitioners employers. Despite being this program a discretionary, confidential option for medical practitioners, WPHP reports as a formal complaint to DOH any practitioner that opts not to follow their recommendations.

23. After expressing his disagreement with QVMC's administration mandate regarding the referral to WPHP for mental health evaluation, Dr. Cornu-Labat complied and contacted the WPHP. Following several weeks of interactions with WPHP personnel Dr. Cornu-Labat put in evidence unreasonable and/or

outrageous conditions non-conducive to a fair and unbiased mental health evaluation being imposed by WPHP together with intimidating and discriminatory behavior portrayed by WPHP practitioners towards him. Dr. Cornu-Labat decided it was not possible for this entity to carry out the necessary evaluation in a fair and unbiased way. Dr. Cornu-Labat consequently expressed such decision and the corresponding grounds for it to WPHP and the QVMC authorities.

24.     While interacting with WPHP Dr. Cornu-Labat submitted to 4 distinct and independent psychological, neuropsychological and psychiatric evaluations. These evaluations uniformly showed him to have a normal emotional and mental state and no evidence of any pathology.

25.     Dr. Cornu-Labat presented reports of these evaluations to QVMC authorities. Without legitimate justification and with evident bad faith and malice, Dr. Cornu-Labat's employer rejected the results of these evaluations, placed petitioner on an unpaid administrative leave, banned him from entering the facility or contacting any employees and eventually unlawfully fired him, making subsequently inappropriate comments to the local media without the corresponding clarifications and engaging thereon in a systematic campaign to defame and discredit Dr. Cornu-Labat in the community of Quincy, contributing to blacklist petitioner in the state of Washington.

26.     At the conclusion of his interactions with WPHP Dr. Cornu-Labat self-reported to DOH that issues had been raised against him, the circumstances surrounding these issues, and requested an investigation by the department.

27.     Based on Dr. Cornu-Labat's self-report to DOH, MQAC opened case number 2009-140022MD in October 2009.

28.     Wayne Carlson, PA-C, Medical Investigator for MQAC, purportedly carried out the investigations concerning case number 2009-140022MD. There is no evidence in the case files (Master case No. M2010-84 as it would be later

COMPLAINT - 6                    **GASTON CORNU-LABAT**

identified) to show that Mr. Carlson ever carried out any in-depth investigation of the circumstances surrounding said case aside from a brief interview with the hospital's CEO, and requesting written statements from QVMC and Dr. Cornu-Labat.

29.    In bad faith QVMC provided in November of 2009 four testimonies in response to Mr. Carlson's request for evidence regarding Dr. Cornu-Labat that proved to be baseless, frivolous, and in one instance with clear evidence of perjury.

30.    In December 2009 Dr. Cornu-Labat was asked by Mr. Carlson to provide explanations regarding his self-report. When Dr. Cornu-Labat presented his response to MQAC he did so in person and requested an acknowledged copy of his response. Dr. Cornu-Labat was frankly mistreated by the MQAC employee receiving Dr. Cornu-Labat's response and who refused to acknowledge the copies as requested. After consulting with counsel, Dr. Cornu-Labat was obliged to drive again the next day from Quincy, WA to Tumwater, WA, request a manager, and then obtain acknowledged copies of his response to MQAC's request.

31.    Dr. Cornu-Labat filed a complaint with DOH regarding QVMC's irregularities, deficiencies, and unsafe management practices in January of 2010.

32.    Due to the conflict of interest faced by DOH with this complaint filed by Dr. Cornu-Labat regarding the public safety and other issues in QVMC because the widespread Life Safety Code violations present in QVMC for so long were in part consequence of DOH and WSP negligence in their inspections of this facility, Dr. Cornu-Labat also filed this same complaint with the State Auditor's Office and with the Healthcare and Wellness Committee of the Washington state Legislature.

33.    DOH dismissed this complaint. Upon request for re-evaluation of the dismissal by Dr. Cornu-Labat, specifically pointing out to the missing inspections by WSP for almost 3 years from June 2006 to April 2009, DOH resolved only to forward the complaint to WSP. Washington State Patrol never answered to this

1    complaint neither did DOH report any follow up in this regard.

2         34.    MQAC case 2009-140022MD remained inactive for several months.

3    MQAC failed to act on Dr. Cornu-Labat's case disposition in a timely fashion,

4    extending beyond all recommended time quotas. Due to the lack of timely

5    resolution in this matter Dr. Cornu-Labat lost employment offers in other states.

6         35.    In June 2010 QVMC employees filed a complaint with DOH against

7    QVMC regarding employee abuse, illegal disposal of toxic biochemical and

8    biological hazards and unsafe patient care practices among other issues. These

9    employees requested DOH for whistle blower protection.

10        36.    Dr. Cornu-Labat repeatedly requested in writing a prompt resolution

11   of the case, receiving no answer at all from MQAC through July 2010. Karen

12   Caille, staff attorney in charge of Dr. Cornu-Labat's self-reported case,

13   acknowledged to Dr. Cornu-Labat's counsel that she failed to forward Dr. Cornu-

14   Labat's letters requesting a prompt resolution to the MQAC Commissioners.

15        37.    Dr. Cornu-Labat ultimately had to plead for intervention in the matter

16   from his district representatives. Senator Janea Holmquist received contact from

17   Dr. Cornu-Labat around July 7, 2010 and purportedly concluded her intervention

18   requesting prompt resolution of the case on or around July 23rd, 2010.

19        38.    DOH acknowledged the complaint filed by QVMC employees in June

20   2010 on July 20, 2010 and assigned it the "complaint investigation number"

21   28058. A few days later DOH conducted a sham investigation of QVMC following

22   up on this complaint. DOH investigators failed to properly interview the witnesses

23   provided in the complaint and failed to request the evidence they had been advised

24   by the complainants was available to demonstrate the issues of concern. After

25   visiting with QVMC's administrators DOH concluded there was no merit to the

26   complaints and leaked to the administration the complainants' identity. Both

27   Candace Erickson and Sara Keller, QVMC employees at the time who had filed

28

COMPLAINT - 8            **GASTON CORNU-LABAT**    15446 BEL-RED RD, STE B-
                                                   10, REDMOND WA 98052
                                                   425-497-5063

the complaint numbered 28058, were victims of retaliation by the QVMC
administration.

39.     On July 22nd, 2010 MQAC issued a Notice of Intent to Order
Investigative Mental Examination of Dr. Cornu-Labat. With this notice MQAC
provided Dr. Cornu-Labat with a copy of the bulk of the case file that included the
testimonies presented by QVMC associated individuals relating to his purported
"abnormal" behavior. One year after the fact Dr. Cornu-Labat for the first time
gained access to the contents of the issues that had been brought up against him.

40.     Regarding the evidence in which they based their intent to order an
investigative mental evaluation of Dr. Cornu-Labat, MQAC failed to provide the
grounds that made the evidence credible and reliable despite being required to do
so by statute. Most of the evidence in which MQAC based their intent to order an
investigative mental evaluation of Dr. Cornu-Labat was neither credible nor
reliable.

41.     MQAC offered Dr. Cornu-Labat the chance to challenge the Notice of
Intent to Order Investigative Mental Evaluation in writing.

42.     Dr. Cornu-Labat challenged this Notice of Intent to Order presenting a
detailed analysis providing a predominance of evidence to prove that (a)the
testimonies given by QVMC were incredible and unreliable and in evident bad
faith, (b) these actions had been taken in retaliation for whistle blowing, (c) DOH
had failed to conduct an appropriate investigation showing no interest in
addressing QVMC's problems openly and professionally except by acting against
Dr. Cornu-Labat guided by an unfair presumption of guilt on his part, (d) these
actions were non-conducive to the development of DOH's function as the
safeguard of people's health and wellbeing, (e) there were issues of public concern
still present in QVMC, and finally (f) that petitioner was more than suitable as a
person and a professional to practice medicine safely and that (g) these

proceedings had caused him and his family great harm.

43.    Dr. Cornu-Labat filed with the Quincy Police Department charges of perjury and criminal conspiracy to commit perjury and other charges against QVMC authorities and employees, and DOH employees involved with the handling of his case for the false statements presented at these proceedings being addressed in this petition and the concerted intent to derail his career and discredit him.

44.    After an alleged review by MQAC Commissioners William Gotthold and Theresa Elders, MQAC issued an Order for Investigative Mental Health Evaluation of petitioner, again failed to provide the grounds in which MQAC based the decision that the evidence relied upon for such order was credible and reliable, failed to explain petitioner why the submitted mental health evaluations had been ignored and why all the evidence presented by Dr. Cornu-Labat to the contrary had been ignored too. MQAC failed to offer a hearing to address all these disputed facts.

45.    Explaining that MQAC and DOH had acted unfairly and without any justification, abusing its authority, and in clear conflict of interest and establishing double standards in all that related to QVMC by magnifying anything that could be used against Dr. Cornu-Labat while minimizing or disregarding anything presented in his favor, and explaining that he was concerned about a biased and unfair mental health evaluation in conditions adverse to him and that both QVMC and DOH had acted in collusion and clear bad faith; deeming this order as unwarranted and inappropriate he refused to comply with it.

46.    Based exclusively on this refusal MQAC accused Dr. Cornu-Labat of unprofessional conduct and invited him to request a hearing to address this matter. Dr. Cornu-Labat, with foreknowledge that this proceeding would be a kangaroo court, requested a hearing on the matter.

COMPLAINT - 10                    **GASTON CORNU-LABAT**       15446 BEL-RED RD, STE B-10, REDMOND WA 98052
425-497-5063

47.    Dr. Cornu-Labat's counsel at that time requested discovery including all reports and notes of DOH's investigation of the case. DOH specifically failed to provide Mr. Carlson's investigative report and notes.

48.    Dr. Cornu-Labat filed a motion to dismiss the case arguing that the order for a new mental health evaluation was unwarranted and inappropriate. Dr. Cornu-Labat further filed new evidence to show that (a) DOH had failed to provide grounds for the evidence it relied upon for the order to be credible and reliable when petitioner had proved the contrary with a preponderance of evidence, (b) DOH had a conflict of interest by being partly responsible together with Washington State Patrol through their own negligence in QVMC inspections, and becoming Dr. Cornu-Labat's judge, jury and executioner after Cornu-Labat blew the whistle on this facility's problems, (c) DOH had established double standards in all that related to QVMC as previously exposed, and (d) that a criminal conspiracy had been mounted to discredit petitioner.

49.    Presiding Officer John Kuntz ruled against this motion and declared the new evidence presented by petitioner as inadmissible, incorrectly arguing that it had been presented before. Mr. Kuntz also ruled that at the upcoming hearing the only subject allowed to be argued would be if Dr. Cornu-Labat had complied or not with the order issued by DOH on Sept 2010.

50.    At the April 1st 2011 hearing MQAC counsel objected all arguments and the expert witness brought forth by Dr. Cornu-Labat to show the inappropriateness of MQAC's order and discarded the arguments about the conflict of interest faced by DOH with this case. The Presiding Officer accepted these objections.

51.    On April 29, 2011 the presiding MQAC panel members Leslie M. Burger, Richard Brantner, Michael Concannon, and Bruce Cullen ruled against petitioner declaring that he committed unprofessional conduct and suspended his

license to practice medicine indefinitely pending compliance by Dr. Cornu-Labat
with MQAC's order from Sept 2010. In this ruling the Commissioner
misrepresented the conflict of interest faced by DOH and brought forth by Dr.
Cornu-Labat as an unspecified conflict of interest that petitioner faced with his
former employer. DOH subsequently notified the National Practitioner's Databank
of this decision.

52.    Following his license suspension Dr. Cornu-Labat presented a Petition
for Judicial Review in Grant County Superior Court but was unable to follow
through due to the emotional distress, lack of financial resources and consequent
inability to secure legal counsel. Dr. Cornu-Labat pleaded to numerous agencies
for redress of this whole situation with no results.

53.    After having exhausted everything in his power to revert this unfair
suspension of his license, Dr. Cornu-Labat complied with MQAC's order and
underwent neuropsychological and psychiatric evaluations with the providers
chosen by MQAC.

54.    Both evaluations confirmed beyond any doubt what Dr. Cornu-Labat
had been asserting all along through his multiple writings, pleadings, witnesses and
reports: that *"there is no credible evidence in the record's file or in my
examination of Dr. Cornu-Labat that supports a conclusion that he has any mental
health condition, whatsoever, including Bipolar Disorder"* [RA Vandenbelt, MD].
Furthermore, the reports pointed out to evidence of failure in due process and
further stressed the baselessness of the accusations brought up against Dr. Cornu-
Labat.

55.    Dr. Cornu-Labat and his family have been deeply aggrieved by this
prolonged, illegitimate and unlawful process, having him lost three years of hands
on experience in surgery critical to the maintenance of his surgical skills which
gravely compromised his chances of obtaining employment or establishing a

practice in his field of expertise. A practicing surgeon's starting salary averages between $300,000 and $350,000 a year plus benefits and productivity bonuses for a hospital based employed position. In a successful private practice the earning potential for a general surgeon is much higher. The Cornu-Labat family has been severely damaged financially, morally and emotionally and Dr. Cornu-Labat has suffered irreparable damage to his reputation.

## V.    FIRST CLAIM: VIOLATION OF RICO 18 U.S.C. § 1961–1968
### (ALL DEFENDANTS)

56.    Plaintiff realleges and incorporates by this reference allegations set forth in Paragraphs 1 through 55 above.

57.    Defendants falsified information and committed perjury and/or conspired for the commitment of perjury in furtherance of their obstruction of justice and retaliation against Plaintiff's legal whistleblowing activities the effect of which was to damage Plaintiff in manners and amounts to be proven at time of trial.

58.    Defendants obstructed justice and/or conspired to obstruct justice to Plaintiff's detriment the effect of which was to damage Plaintiff in manners and amounts to be proven at time of trial.

59.    Defendants retaliated for whistle blower activity and/or conspired to retaliate for whistle blower activity the effect of which was to damage Plaintiff in manners and amounts to be proven at time of trial.

60.    Defendants maintained interest in, or control over, QVMC through this pattern of racketeering activity the effect of which was to damage Plaintiff in manner and amount to be proven at time of trial.

## VI.   SECOND CLAIM: VIOLATION OF 42 U.S.C. §§ 1983 AND 1985
### (ALL DEFENDANTS)

61.    Plaintiff realleges and incorporates by this reference allegations set

COMPLAINT - 13                     **GASTON CORNU-LABAT**     15446 BEL-RED RD, STE B-10, REDMOND WA 98052
425-497-5063

forth in Paragraphs 1 through 55 above.

62.  Defendants acted under color of law.

63.  Defendants conspired to deprive Plaintiff of liberty and property interests established, and rights protected, by the Constitution of the United States, its Amendments and related federal laws including but not limited to applicable whistle blower acts.

64.  Defendants deprived Plaintiff of liberty and property interests established, and rights protected, by the Constitution of the United States, its Amendments and related federal laws, as alleged above, including but not limited to applicable whistle blower acts.

65.  Plaintiff was damaged.

## VII.  THIRD CLAIM: OUTRAGE
### (ALL DEFENDANTS)

66.  Plaintiff realleges and incorporates by this reference allegations set forth in Paragraphs 1 through 55 above.

67.  Defendants engaged in extreme and outrageous conduct.

68.  Defendants intentionally or recklessly inflicted emotional distress.

69.  Plaintiff suffered severe emotional distress and damages.

## VIII.  FOURTH CLAIM: DEFAMATION
### (ALL DEFENDANTS)

70.  Plaintiff realleges and incorporates by this reference allegations set forth in Paragraphs 1 through 55 above.

71.  Defendants made a false statement or statements about Plaintiff.

72.  Defendants' statement or statements were unprivileged.

73.  Defendants were at fault for making the statements.

74.  Plaintiff was damaged.

COMPLAINT - 14                    **GASTON CORNU-LABAT**           15446 BEL-RED RD, STE B-
                                                                  10, REDMOND WA 98052
                                                                  425-497-5063

## IX.   FIFTH CLAIM: FALSE LIGHT
### (ALL DEFENDANTS)

75.   Plaintiff realleges and incorporates by this reference allegations set forth in Paragraphs 1 through 55 above.

76.   Defendants publicized a matter that placed Plaintiff in a false light.

77.   The publication would be highly offensive to a reasonable person.

78.   Defendants knew or recklessly disregarded the falsity of the publication and the false light in which Dr. Cornu-Labat would be placed.

79.   Plaintiff was damaged.

## X.   SIXTH CLAIM: MALICIOUS PROSECUTION
### (ALL DEFENDANTS)

80.   Plaintiff realleges and incorporates by this reference allegations set forth in Paragraphs 1 through 55 above.

81.   Defendants instituted or continued a prosecution against Plaintiff.

82.   There was want of probable cause for the prosecution.

83.   The proceedings were instituted or continued through malice.

84.   The proceedings will terminate on the merits in favor of Plaintiff or will be abandoned.

85.   The Plaintiff suffered damage.

## XI.   SEVENTH CLAIM: NEGLIGENCE
### (ALL DEFENDANTS)

86.   Plaintiff realleges and incorporates by this reference allegations set forth in Paragraphs 1 through 55 above.

87.   Defendants had a duty to safeguard the public health and safety.

88.   Defendants breached that duty.

89.   Plaintiff was injured.

90.   The Defendants' breach is the proximate cause of Plaintiff's injuries.

COMPLAINT - 15                    **GASTON CORNU-LABAT**    15446 BEL-RED RD, STE B-10, REDMOND WA 98052
                                                            425-497-5063

## XII.  PRAYERS FOR RELIEF

Having stated his complaint and claims, Plaintiff requests the following relief:

1.    An award of Plaintiff's damages, including but not limited to damages for loss of reputation and harm to career, emotional distress damages, punitive damages, and general damages;

2.    Injunctive relief requiring Defendants to expunge their records of Plaintiff's medical license suspension;

3.    An award of Plaintiff's costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable court rule, statute, or recognized ground in equity; and,

4.    Such further relief as the court deems just and equitable.

Dated this **7** day of May, 2014.

Respectfully submitted,

**Gaston Cornu-Labat, MD**
**15446 Bel-Red Road, Suite B-10**
**Redmond, WA 98052**
**425-497-9558**

COMPLAINT - 16                              **GASTON CORNU-LABAT**            15446 BEL-RED RD, STE B-
                                                                           10, REDMOND WA 98052
                                                                              425-497-5063